**J.P. MORGAN DELAWARE, Plaintiff,**

v.

**ONYX ARABIANS II, LTD., et al., Defendants.**

**Civ. A. No. C–89–0920–L(M).**

United States District Court,
W.D. Kentucky,
at Louisville.

April 28, 1993.

Michael A. Valenti, Marvin J. Hirn, Hirn, Reed & Harper, Louisville, KY, Howard B.

Levi, Kornstein, Veisz & Weasker, New York City, for plaintiff.

Culver V. Halliday, Samuel D. Hinkle, Greenebaum, Boone, Treitz, Maggiolo & Brown, Louisville, KY, for defendants.

## MEMORANDUM

MEREDITH, Chief Judge.

This matter is before the Court on the parties' cross motions for summary judgment. Fed.R.Civ.P. 56. Plaintiff, J.P. Morgan Delaware (Morgan), is a banking corporation with its principal place of business in Wilmington, Delaware. Defendant Onyx Arabians II, Ltd., is a limited partnership with its principal place of business in Georgia. Defendant Onyx Arabians, Inc. is a Georgia corporation. The defendants will hereinafter be referred to collectively as "Onyx." This Court has jurisdiction based on diversity of citizenship. Title 28 U.S.C. § 1332.

Onyx entered into two Agreements in Kentucky which are to be construed according to Kentucky law. One with Bethesda Farm, Inc. (Bethesda) and Lasma Arabians, Ltd. (Lasma I) to purchase Share 11 in a syndicated Arabian Stallion named Strike (the Strike Agreement) and another with Lasma I to purchase four mares (the Mares Agreement) (Onyx alleges that two of the mares were to be bred to Strike and one mare, "Loves Farewell," was to be repurchased on August 12, 1989). Shortly thereafter, Onyx executed and delivered to Bethesda and Lasma I a promissory note in the principal amount of $202,500.00 (the Strike Note), evidencing the unpaid balance of the purchase price of Share 11. Onyx also executed and delivered to Lasma I a promissory note in the principal amount of $768,000.00 (the Mares Note), for the unpaid balance of the purchase price for the mares. Approximately three months later, on or about December 11, 1985, Lasma I transferred all of its rights and interests to Lasma Arabians, Ltd. (Lasma II). On or about June 2, 1986, Bethesda transferred its interest in the Strike Note to Lasma II. Only Bethesda transferred its interest in the Strike Note by endorsement to Lasma II. Subsequently, Lasma II trans-ferred its interest in the Strike Note and the Mares Note to Morgan, endorsing the Notes and delivering them to plaintiff. Lasma II filed for bankruptcy on July 1, 1988. Morgan alleges that the defendants defaulted in the payment of the Notes and that it is entitled to payment on the Notes.

Onyx, by affirmative defenses and counterclaim, alleges that the Strike Agreement was breached when Strike became unavailable to stand on the East Coast, that the Mares Agreement was breached by Lasma II's failure to repurchase "Loves Farewell" or to provide Onyx with breeding rights in selected stallions and that Morgan unreasonably withheld consent to sell or register or release existing registration of the mares and the mares' foals.

■ Plaintiff contends that it is a holder in due course of the two notes and as such is entitled to payment free from any claims or defenses asserted by the defendants. See KRS 355.3–302.

The promissory notes were originally payable to both Bethesda and Lasma I. Lasma I did not endorse the notes when they were transferred to Lasma II. See *Karsner v. Cooper, Sr.,* 195 Ky. 8, 241 S.W. 346 (1922) and KRS 355.3–116(2). Therefore, Lasma II was a holder without endorsement throughout the entire time the notes were in its possession. The notes are payable to order and as such can be negotiated only by endorsement. KRS 355.3–202(1). Lasma II had the specifically enforceable right to have the endorsement of Lasma I and had Lasma II enforced that right, negotiation would have taken place at the time of the endorsement. KRS 355.3–201(3). When Lasma II assigned its rights to Morgan, the right to Lasma I's endorsement necessarily passed to Morgan. KRS 355.3–201(1). Without the endorsement, the requirement of prior negotiation is absent, and Morgan Bank is a mere transferee and not a holder in due course. KRS 355.3–201, 3–202(1) and (3). See *Bank of Commerce of Louisville v. Abell,* 298 Ky. 736, 741, 184 S.W.2d 86, 89 (1944) ("[U]ntil such endorsement had actually been given [appellant] held only an equitable title.") As a transferee, Morgan is subject to defen-

dants' defenses and claims regarding the notes.

Plaintiff asserts that both Agreements contain clauses limiting defendants' right to assert either claims or defenses.

The terms of the Syndicate Agreement are incorporated into the Strike Agreement. Section 8 of the Syndicate Agreement provides in pertinent part:

(b) Each Co–Owner hereby releases, waives and extinguishes any claim, cause of action, loss, demand or liability, including without limitation any claim or right of subrogation, which such Co–Owner has or may have in the future against Bethesda Farm, Lasma Arabians, the Syndicate Manager, the Farm or their respective owners, officers, employees, servants, attorneys, accountants, agents or assigns arising from actions or inactions in connection with this Agreement, so long as such actions or inactions such not constitute gross negligence or willful misconduct.

(c) Each Co–Owner shall indemnify and hold harmless Bethesda Farm, Lasma Arabians, the Syndicate Manager, the Farm and their respective owners, officers, employees servants, attorneys, accountants, agents and assigns from and against any claim, cause of action, demand or liability, and from any loss, cost or expense, including without limitation attorneys' fees, arbitration expense or court costs, which may be made or imposed upon any of them by reason of any action or inaction performed or taken on behalf of the Syndicate or any Co–Owner or in connection with the syndication of the Stallion, except for acts of gross negligence or willful misconduct.

Paragraph 18 of the Mares Agreement provides:

WAIVER OF DEFENSES AGAINST ASSIGNEE: In the event Seller assigns this contract or the Note to a third party for value without notice of a claim or defense by Buyer, Buyer agrees not to assert against such assignee any claim, setoff or defense that Buyer may have against Seller.

■ Paragraph 18 of the Mares Agreement appears on the reverse side of the single page contract document signed by the parties. KRS 446.060(1) states that a writing "shall not be deemed to be signed unless the signature is subscribed at the end or close of the writing." Kentucky courts have applied the statute strictly, holding that parties are not bound by matters which do not appear above their signatures unless additional contract terms have been clearly incorporated by reference above the signature line. *Consolidated Aluminum Corp. v. Krieger,* 710 S.W.2d 869 (Ky.App.1986). The Mares Agreement contains language on the front of the page above the signatures which incorporates terms printed on the reverse relating to express warranties. There is no incorporation of the "Waiver of Defenses" clause and so, under the law of the Commonwealth of Kentucky, we must hold that the defendants are not bound by it.

In regard to the Strike Agreement, KRS 355.9–206(1) provides that a buyer, who signs both a negotiable instrument and a security agreement (as Onyx has done), may agree not to assert against an assignee any claim or defense which he may have against the seller. It further provides that such an agreement is enforceable by an assignee who takes the assignment for value, in good faith, and without notice of a claim or defense, except as to defenses which may be asserted against a holder in due course of a negotiable instrument under article three of the Uniform Commercial Code. KRS 355.3–305(2). (The statutory defenses are not relevant in this action.) Section 355.9–206(1) gives qualified assignees the protection afforded to a holder in due course, without the added requirement of effective negotiation. See *Young v. Auxier,* 302 Ky. 571, 195 S.W.2d 295 (1946) (Evidence of intent to assign is sufficient to prove valid assignment.)

■ Onyx argues that Morgan took the Notes with notice of claims and defenses. KRS 355.1–201(25) provides:

A person has "notice" of a fact when

(a) He has actual knowledge of it; or

(b) He has received a notice or notification of it; or

(c) From all the facts and circumstances known to him at the time in question he has reason to know that it exists.

Onyx contends that Morgan should have known of Onyx's claims and defenses to the Notes because Lasma II was willing to sell 148 notes at a discount to Morgan and Morgan had been notified of a pending lawsuit against Lasma II alleging fraud in conducting Arabian horse auctions. Under the circumstances of this case, whether Morgan should have known that Onyx had claims against Lasma II and defenses against payment of the Notes is a question of fact not appropriate for summary judgment. *McCoy v. Mosley Machinery Company*, 33 F.R.D. 287 (E.D.Ky.1963); Fed.R.Civ.P. 56. Similarly, Onyx's arguments regarding Morgan's "bad faith" may only be resolved by factual determination. *Id.*

Onyx alleges that Morgan's commercially unreasonable conduct in refusing to permit registration of new foals and in refusing to allow Strike to stand on the East Coast destroyed the value of the Notes to defendants and amounted to improper repossession of the collateral. Defendants were notified about October, 1987, that Strike would not stand on the East Coast. Onyx also alleges that the Mares Agreement was breached by plaintiff on March 1, 1988, by the sale of certain stallions to which the mares were to be bred.

 In Kentucky, a secured party has the burden to show that it acted with commercial reasonableness. *Bank of Josephine v. Conn*, 599 S.W.2d 773 (Ky.App.1980). In the case *sub judice* whether Morgan's conduct was commercially reasonable is a factual question and we will not grant summary judgment on this issue. Fed.R.Civ.P. 56.

 Defendant contends that plaintiff breached the Strike Agreement by refusing to stand Strike at any location on the East Coast. The Strike Agreement names Bethesda as Syndicate Manager and provides, in Section 3(c):

The Stallion shall stand at Bethesda Farm, 1977 Edison Street, Santa Ynez, California until July 1, 1985. From July 1, 1985 through the end of the 1986 Breeding Season, the Stallion shall stand at Lasma East, 4714 Tobacco Road, L'Esprit, La-Grange, Kentucky. Following the 1986 Breeding Season, the Stallion shall be returned to Bethesda Farm to stand at Bethesda Farm for the 1987 Breeding Season. Thereafter, the Stallion shall be moved between Lasma East and Bethesda Farm each year so that it stands alternately at either Lasma East or Bethesda Farm each Breeding Season. The Syndicate Manager may, in its discretion, alter this schedule and select different locations at which the Stallion shall stand, in which event the Syndicate Manager shall give each Co–Owner prompt written notice of such change in the location of the Stallion. (Bethesda Farm, Lasma East or such other farm at which the Stallion may stand is hereinafter referred to as the "Farm.") In the event the Syndicate Manager selects a location other than Bethesda Farm or Lasma East for the Stallion to stand, the Co–Owners, by a vote of the Co–Owners owning at least 80% of the Fractional Interests (i.e., 48 of the 60 Fractional Interests), may (i) determine that such location selected by the Syndicate manager is unacceptable and (ii) select a different location at which the Stallion shall stand.

Plaintiff argues that the Syndicate Manager simply exercised its discretion pursuant to the Agreement in standing Strike at Bethesda.

 In the interpretation of contracts, Kentucky courts consider the intention of the parties from the contract as a whole. *Taylor v. Rosenthal*, 308 Ky. 4, 213 S.W.2d 435 (1948).

In attempting to arrive at that intention the subject matter of the contract, the situation of the parties and the conditions under which the contract is written must be taken into consideration, and words must receive their ordinary meaning when there is nothing to show that they were used in a different sense.

*Id.* at 5, 213 S.W.2d at 437. The subject matter of the Strike Agreement is the purchase of a stallion for the purpose of breeding it to mares. It is clear that at the time the Agreement was signed, Onyx had pur-

chased mares to be bred to the stallion and the mares were housed in LaGrange, Kentucky. It was at least impractical and, at most, risky for Onyx to transport its mares to California to breed with Strike. The plain words of Section 3(c) allow the Syndicate Manager to "select different locations at which the Stallion shall stand." (Emphasis added.) In the case at hand, the Syndicate Manager chose to keep Strike at Bethesda Farm for reasons not revealed in the record. However, the language of the contract and the situation of the parties at the time the Agreement was signed convinces the court that the parties did not intend that Strike stand permanently at Bethesda Farm.[1] We find that the Strike Agreement was breached by the Syndicate Manager's actions. However, as noted above, if the waiver clause in the Strike Agreement is applicable, Onyx will have to show that the Syndicate Manager's breach amounted to gross negligence or willful misconduct.

 The defendants' claims that Lasma I was to repurchase Loves Farewell is based on an oral promise made during negotiation of the Mares Agreement by Lasma I's President, Gene LaCroix. The promise was put into writing subsequent to the execution of the Mares Agreement.

In Kentucky, evidence of a contemporaneous oral agreement is not admissible except under certain statutory exceptions to the parol evidence rule. *Sheffer v. Chromalloy Mining and Mineral Div. of Chromalloy American Corp.*, 578 S.W.2d 594 (Ky.App. 1979). One such exception is codified at KRS 355.2–202(b) which provides that evidence of a contemporaneous oral agreement which contains additional terms consistent with a written agreement is admissible to supplement the meaning of the written agreement "unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."[2] We find that an oral agreement to buy back or "put" Loves Farewell does not contradict the terms of the Mares

Agreement and, indeed, explains why defendants agreed to purchase four mares. The promise to repurchase Loves Farewell was obtained in writing, at Onyx's request, subsequent to the execution of the written Mares Agreement. LaCroix, Lasma I's representative during negotiation of the Mares Agreement has testified that he believed the oral promise had been reduced to writing and included in the initial Mares Agreement. (LaCroix depo. at p. 125). We find that the parties to the Mares Agreement intended to include a repurchase provision and the failure to honor that provision is a breach of the Agreement.

 On the same day that Onyx signed the Mares Agreement, it entered into a "Purchase Agreement" with Lasma I for a "Breeding Package." The Package called for Lasma I to provide a list of stallions available for breeding and the stud fee for each such breeding. The record shows that the most valuable stallions were sold in 1988. Onyx alleges that the Mares Agreement and the Package were "interrelated," in that the services of the stallions were necessary to the purpose for which the Mares Agreement was signed and therefore, the Mares Agreement was breached by the sale. The Breeding Package contains a merger clause reciting that the written agreement "contains the entire understanding of the parties concerning its subject matter." Onyx does not allege that any oral promises were made that the stallions would not be sold or that the stallions would always be of a high caliber. Onyx does not show any proof that it attempted to acquire breeding rights elsewhere. We find that the sale of the stallions did not constitute a breach of contract.

Plaintiff's motion for summary judgment will be denied. Defendants' motion for summary judgment will be partially granted. An appropriate order will be entered this date.

---

1. Also, if, as the defendants allege without supporting evidence, Bethesda owned either 80% or more of the shares, the contract provision pertaining to the Co–Owners vote would be rendered meaningless.

2. A merger clause appears in the Mares Agreement on the reverse side of the signed document and is ineffective since not incorporated by reference on the front of the page. KRS 446.060(1).